**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **ERIC REED and EDWARD RUCKER,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | **Case No.** |
| | ) | |
| **v.** | ) | **Judge** |
| | ) | **Magistrate Judge** |
| **MASTEC UTILITY SERVICES, LLC,** | ) | |
| | ) | **Jury Demand** |
| **Defendant.** | ) | |

# COMPLAINT

For their Complaint against Defendant MasTec Utility Services, LLC ("Defendant"), Plaintiffs Eric Reed ("Mr. Reed") and Edward Rucker ("Mr. Rucker") (collectively "Plaintiffs") state:

## PARTIES

1. Mr. Reed is an employee of Defendant in Nashville, Tennessee.

2. Mr. Rucker is a former employee of Defendant in Nashville, Tennessee.

3. Defendant is a Florida limited liability company with its principal place of business at 800 S. Douglas Road, Suite 1200, Coral Gables, FL 33134. Defendant may be served with process through its registered agent, Corporation Service Company, 2908 Poston Avenue, Nashville, Tennessee 37203-1312.

## JURISDICTION AND VENUE

4. This is an action for damages and equitable relief for unlawful employment practices brought under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq*. ("Title VII"), and 42 U.S.C. § 1981 ("Section 1981"). The Court has jurisdiction under 28 U.S.C. §§ 1331, 1332, and 1343(a)(4). Venue is proper under 28 U.S.C. § 1391.

5. Plaintiffs have met all conditions precedent to the filing of this Complaint. They each timely filed a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC") on February 10, 2025. The EEOC issued each a Notice of Right to Sue on May 15, 2026.

**FACTS**

6. Mr. Reed and Mr. Rucker are African American males. They both began working for Defendant in its Overhead Division in Nashville, Tennessee, on or about August 1, 2019.

7. Mr. Reed is a Line Foreman and a supervisor for Defendant over a crew of four Operators.

8. Mr. Rucker was an Equipment Operator for Defendant through or about December 31, 2025.

9. Mr. Reed and Mr. Rucker are and were qualified for their jobs with Defendant and performed them in an excellent manner. Before working for Defendant, they both worked for Nashville Electric Service ("NES") as working foremen for 32 years.

10. During their employment, Plaintiffs were the only two African American employees in Defendant's Overhead Division.

11. During Plaintiffs' employment, Defendant discriminated against them in the terms, conditions, and privileges of employment and subjected them to disparate treatment because of their race.

12. For example, Defendant paid Plaintiffs less than similarly situated and less experienced, non-African American employees for the same or equivalent work; invited and allowed non-African American employees to work Sunday and other higher paying shifts and to accumulate overtime while not allowing or inviting Plaintiffs to do either; suspended Plaintiffs

from work multiple times without pay for alleged reasons for which it did not suspend non-African American employees; and refused to allow Plaintiffs to return to work in temporary light duty jobs following injuries or leaves but allowed non-African American employees to do so, among other repeated acts of disparate treatment.

13. Further, Mr. Rucker repeatedly requested pay raises from Defendant, which Defendant denied him. Nashville General Manager Jerry Eaves also repeatedly promised Mr. Rucker pay raises, but neither he nor Defendant ever provided them.

14. Moreover, during Plaintiffs' employment, Defendant created, allowed, maintained, and failed to remedy a racially hostile work environment that altered the conditions of their employment.

15. The racial harassment was unwelcome and offensive, severe or pervasive, and made it more difficult for Plaintiffs to perform their jobs.

16. Defendant's Caucasian managerial agents and employees subjected Plaintiffs to repeated racially derogatory slurs and comments, referred to them in racially derogatory terms, and subjected them to threats, mistreatment, and disparate treatment as compared to non-African American employees.

17. For example, Caucasian Line Foreman Russell Houston, who is a supervisor, and his Caucasian work crew repeatedly used racially discriminatory epithets and offensive slurs to and about Plaintiffs and other African American individuals, including but not limited to repeated use of the highly offensive word "nigger" in the workplace.

18. On the afternoon of June 19, 2024, Mr. Houston stated in Superintendent Ron Jennings' office—in front of Mr. Rucker—that he was "tired of these niggers getting all these

days" and "don't these niggers have a nigger holiday already?" in reference to the Juneteenth holiday.

19. Thus, Mr. Houston, a supervisor, used an abhorrent racial epithet three (3) times in another supervisor's office, and in front of Mr. Rucker.

20. This was not the only time Mr. Houston and his Caucasian employees had used the word "nigger" and other highly offensive racist statements in Defendant's workplace. Rather, this was ongoing, repeated, and frequent behavior by them, as multiple witnesses have confirmed.

21. Defendant should have summarily discharged Mr. Houston on June 19, 2024, given the circumstances, but it did not.

22. Nor did Defendant suspend Mr. Houston or remove him from the workplace pending any investigation.

23. Instead, Mr. Jennings stated to Mr. Houston that he could "not talk like that."

24. Mr. Houston did not listen to Mr. Jennings, however, and continued spewing racial epithets in the workplace.

25. Indeed, Mr. Houston next went into former General Foreman Kevin Jones' office and made the same, repeated and abhorrent racist comments three times *again*— in front of Mr. Rucker, Mr. Jones, Mr. Eaves, and Line Foremen Scott Long and Ray Osborne.

26. Thus, Mr. Houston, a supervisor, again used the abhorrent racial epithet three (3) more times in another supervisor's office, and again in front of Mr. Rucker.

27. Again, Defendant should have summarily discharged Mr. Houston given the circumstances, including his complete disregard of Mr. Jennings' statement to him, but it did not.

28. Nor did Defendant suspend Mr. Houston or remove him from the workplace pending any investigation, despite his using the word “nigger” six (6) times in two (2) different supervisors’ offices, and in front of Mr. Rucker, an African American, both times.

29. Instead, Mr. Eaves inexplicably *laughed out loud* at Mr. Houston’s racist statements—and in front of Mr. Rucker. This contributed to the racially hostile work environment.

30. Mr. Jones told Mr. Houston that he could “not talk like that” and to leave his office.

31. Immediately after these shocking and severe instances of blatant racial harassment to which he was subjected, Mr. Rucker opposed, reported, and complained about Mr. Houston’s racially offensive statements to Mr. Eaves and told him how offended he was by them and that Mr. Houston’s racist conduct must stop.

32. Mr. Eaves did not orally respond to Mr. Rucker but, instead, frowned at him.

33. Mr. Rucker then reported Mr. Houston’s offensive racist statements in both Mr. Jennings’ and Mr. Jones’ office—and Mr. Eaves’ laughing out loud about them and failing to take any corrective action in response to his complaint about it—to Mr. Reed, who was extremely offended by their conduct, as well.

34. Plaintiffs then both reported this severe racial harassment to Mr. Jones in front of Mr. Long, Mr. Osborn, and Warehouse employee Allen Burrows the very next morning, on June 20, 2024.

35. Mr. Burrows stated, “Russell [Houston] *said the same thing* in the warehouse earlier,” meaning that Mr. Houston had used the abhorrent racial epithet at least nine (9) times, on at least three separate occasions, in at least three different areas in Defendant’s workplace.

36. Defendant never suspended Mr. Houston from work and never discharged him for his witnessed, blatantly racist conduct.

37. Mr. Jones acknowledged Mr. Houston's repeated racist statements in an employee meeting on June 20, 2024, and stated that "any further" racial epithets and slurs would not be tolerated.

38. Mr. Eaves was standing in the meeting in which Mr. Jones made this statement but did not speak up or say anything in response or to reinforce what Mr. Jones stated.

39. Rather, Mr. Eaves remained completely silent, which was very disturbing to Plaintiffs since he was the General Manager, and which contributed to the hostile work environment.

40. Plaintiffs then met privately with Mr. Eaves on the afternoon of June 20, 2024. They reported their concerns of racial harassment to him and stated that, as General Manager, his input carried a lot of weight, and that they were concerned that his utter silence would be perceived as acceptance and a condoning of the racism and racially hostile work environment to which they were subjected.

41. Plaintiffs further told Mr. Eaves that, because of the racial harassment they had experienced, they were afraid for their safety and wellbeing and felt they had to constantly "look over [their] shoulders" and "watch [their] backs" based on the racist statements that were being made throughout Defendant's workplace.

42. On June 24, 2024, Mr. Eaves stated during an employee meeting that racial slurs "should not be made at work," but that "*anything and everything is acceptable at the bottom of the hill*," meaning that employees like Mr. Houston could say whatever they wanted to say outside of Defendant's building.

43. Mr. Eaves' statements made Plaintiffs even more uncomfortable and further contributed to the hostile work environment.

44. Mr. Eaves never promptly or timely reported Plaintiffs' complaints of racial harassment to Defendant's corporate Human Resources ("HR") Department.

45. Defendant's HR Department never conducted any prompt or timely investigation of Plaintiffs' repeated complaints of racial harassment.

46. Furthermore, Mr. Eaves repeatedly told Plaintiffs that he did not want any of their reports and complaints of racial harassment to "go any further than [him]."

47. Mr. Eaves specifically instructed Plaintiffs not to report anything, including their concerns of racial harassment, to Defendant's HR Department.

48. Defendant failed and refused to take prompt and appropriate corrective and preventive action following Plaintiffs' opposition to and complaints of race discrimination and harassment, which in these instances reasonably would have included suspending and discharging Mr. Houston based on the severity of his conduct and given his position as a supervisor.

49. Defendant's response to Plaintiffs' complaints manifested indifference or unreasonableness in light of what it knew and reasonably should have known regarding the racially discriminatory conduct.

50. Defendant took no disciplinary action against Mr. Houston or his Caucasian crew members for repeatedly using highly offensive racial slurs, including but not limited to their express use of the word "nigger" throughout Defendant's workplace.

51. Nor did Defendant take any disciplinary action against Mr. Eaves for laughing out loud at Mr. Houston's racist conduct and otherwise condoning it.

52. After Plaintiffs opposed and reported the race discrimination and racial harassment that they experienced, Defendant retaliated against Plaintiffs.

53. Defendant segregated Plaintiffs, isolated them, and subjected them to greatly increased scrutiny and retaliatory micromanagement and additional severe or pervasive discriminatory and retaliatory harassment and acts of sabotage of their work and equipment because they had opposed and reported racial harassment.

54. For example, on or about June 26, 2024, Mr. Rucker attempted to sit in a chair, which he discovered had been tampered with in a physically dangerous manner. When he attempted to sit down, the chair collapsed, causing him to fall and hurt his back, neck and head.

55. Mr. Rucker promptly reported this chair incident to Superintendent Leonard Payne and Safety Director Kevin Johnson.

56. Mr. Johnson inspected the chair and then threw it and other steel chairs in a dumpster and crushed them with a track hoe.

57. Moreover, despite Plaintiffs' direct complaints and reports to Defendant, the severe racial harassment continued.

58. For example, on October 28, 2024, at 7:26 a.m., Lineman Apprentice Kyle Snyder approached Mr. Reed while Mr. Reed was talking to Mr. Rucker and stated, "I cannot drive Line Truck Number 736047 because of what is written in it."

59. Plaintiffs then went to the truck to which Mr. Snyder was referring and discovered abhorrent racist vandalism and graffiti inside of it. As they opened the passenger door, they saw the word "Nigger" carved on both the top of the dashboard and on the front of it above the glovebox.

60. Plaintiffs took photos of the racist graffiti in the truck and immediately reported it to Mr. Eaves and showed him the photos.

61. Mr. Eaves told Mr. Reed not to drive the truck and to leave it parked and use another truck. Mr. Eaves further stated, "See if you can find out who did it," even though conducting such an investigation was his and HR's legal duty and obligation—not Mr. Reed's.

62. Furthermore, Mr. Eaves never addressed Defendant's employees about this highly offensive racial harassment in any meeting.

63. Nor did Mr. Eaves report the ongoing racial harassment to HR, nor did HR conduct any prompt or timely investigation.

64. A couple of days later, Safety Director Kevin Johnson held a meeting with employees in the warehouse to discuss the racist vandalism incident.

65. Mr. Johnson stated, "The damage done to the line truck was directed toward Eric [Reed], the only black foreman here." He said, "Eric [Reed] is a good man, who would give you the shirt off of his back. I cannot believe this kind of behavior is going on at MasTec. This could very well result in a lawsuit."

66. Mr. Johnson's statements were met with deafening silence; no one said anything in response.

67. On or about November 5, 2024, the dashboard in the work truck with the racist graffiti on it was sanded down so that the word "Nigger" no longer showed on it.

68. Nevertheless, Mr. Reed still recalled the graffiti every time he looked toward the sanded down dashboard, or any truck dashboard for that matter.

69. Following their complaints about the racist graffiti in the work truck, Defendant further retaliated against Plaintiffs.

70. For example, on or about December 12, 2024, Mr. Eaves falsely accused Mr. Rucker of texting on his cell phone while at work.

71. Mr. Rucker told Mr. Eaves that he was not texting at all, and that he had simply dropped his phone and the screen protector cracked.

72. Safety Director Johnson verified this fact to Mr. Eaves.

73. Nevertheless, Mr. Eaves discriminated and retaliated against Mr. Rucker and gave him two days off from work—without pay—on December 17 and 18, 2024.

74. Mr. Rucker further experienced and reported to Mr. Eaves the theft of his work tools and further acts of racial and retaliatory harassment, including but not limited to (a) the placing of zip ties all over his work truck, and (b) the breaking of the door handle on his personal truck on January 7, 2025, such that he could no longer open the truck door from the outside or from the inside of the truck.

75. Mr. Eaves failed and refused to report these incidents of sabotage, vandalism, and destruction of property to HR, investigate them, or take any corrective or remedial action.

76. Instead, Mr. Eaves callously and angrily stated to Mr. Rucker that he "d[id] not give a fuck what happened to [Mr. Rucker's] truck" because "it [wa]s not [his] truck."

77. Furthermore, as of late January 2025, Mr. Eaves separated Mr. Reed from Mr. Rucker and would not allow them to work together any longer.

78. Mr. Eaves further took an Apprentice Lineman, Brandon King, away from Mr. Reed in January 2025, and a Lineman, Kyle Tatum, away from him on January 31, 2025, in a retaliatory effort to make it more difficult for him to do and succeed at his job.

79. Mr. Eaves then required Mr. Reed to climb in and out of buckets in bucket trucks without a qualified observer, such as Mr. Tatum, present.

80. On February 3, 2025, Mr. Reed held a meeting with Mr. Eaves, Mr. Johnson, and Superintendent Leonard Payne to address this safety violation and to require compliance with safety rules and regulations.

81. Mr. Eaves did not say anything in response to Mr. Reed's reports about these safety issues.

82. Mr. Payne volunteered to serve as a qualified observer for Mr. Reed on the job site.

83. In or about February or March 2025 Plaintiffs reported race discrimination, racial harassment, and retaliation to Defendant's HR Department.

84. Defendant took no prompt and appropriate corrective or preventative action in response to Plaintiffs' reports.

85. In or about April and May 2025 Defendant attempted to place cameras and recording or monitoring devices in Plaintiffs' work trucks to monitor and eavesdrop on them. Mr. Reed informed Defendant that a camera in his truck had been broken since the racist slurs were carved into its dashboard in October 2024.

86. Defendant thereafter continued to discriminate against Plaintiffs because of race, subject them to disparate treatment as compared to similarly situated, non-African American employees in the terms and conditions of employment, and harass and retaliate against them for opposing and reporting the race discrimination, harassment, and retaliation.

87. The totality of Defendant's discriminatory and retaliatory conduct as described in this Complaint altered the conditions of Plaintiffs' employment and made it more difficult for them to perform their jobs.

88. As described above, Defendant subjected Plaintiffs to and is liable for a racially hostile work environment, in violation of Title VII and Section 1981.

89. As described above, Defendant discriminated against Plaintiffs in the terms, conditions, and privileges of employment and subjected them to disparate treatment because of their race, in violation of Title VII and Section 1981.

90. As described above, Defendant retaliated against Plaintiffs, and subjected them to severe or pervasive retaliatory harassment, for opposing and reporting racial discrimination and harassment, in violation of Title VII and Section 1981.

91. Defendant's conduct as described in this Complaint was malicious and/or recklessly indifferent to Plaintiffs' federally protected rights, entitling them to punitive damages under Title VII and Section 1981.

92. As a direct result of Defendant's discriminatory and retaliatory conduct, Plaintiffs have lost income and other privileges and benefits of employment; suffered embarrassment, humiliation, emotional distress and anxiety, exacerbation of medical conditions, inconvenience, and loss of enjoyment of life; and incurred attorneys' fees, costs and litigation expenses.

**RELIEF REQUESTED**

WHEREFORE, Plaintiffs respectfully request:

1. A jury trial;
2. Back pay and damages for lost benefits;
3. Compensatory damages for embarrassment, humiliation, emotional distress and anxiety, exacerbation of medical conditions, inconvenience, and loss of enjoyment of life;
4. Front pay and damages for lost benefits;
5. Punitive damages;
6. Attorneys' fees, costs and litigation expenses;
7. Prejudgment interest and, if applicable, post judgment interest; and

8. Such other and further legal or equitable relief to which they may be entitled.

Respectfully submitted,

s/Douglas B. Janney III
Douglas B. Janney III (BPR No. 19112)
Law Office of Douglas B. Janney III
5115 Maryland Way
Brentwood, Tennessee 37027
(615) 742-5900
doug@janneylaw.com

Attorney for Plaintiffs